**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00090-NYW

SUZANNE LaVOIE,

      Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This civil action arises under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401–33 for review of the Commissioner of Social Security Administration's ("Commissioner" or "Defendant") final decision denying Plaintiff Suzanne LaVoie's ("Plaintiff" or "Ms. LaVoie") application for Disability Insurance Benefits ("DIB"). Pursuant to the Parties' consent [#11], this civil action was referred to this Magistrate Judge for a decision on the merits. *See* [#19]; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. Upon review of the Parties' briefing, the entire case file, the Administrative Record, and the applicable case law, this court respectfully **AFFIRMS** the Commissioner's decision.

## PROCEDURAL HISTORY

      This case arises from Plaintiff's application for DIB protectively filed on March 19, 2015. [#9-3 at 149].[1] Ms. LaVoie graduated from high school, completed several years of college but

---

[1] When citing to the Administrative Record, the court utilizes the docket number assigned by the CM/ECF system but the page number associated with the Record, found in the bottom right-hand corner of the page. For all other documents the court cites to the document and page number generated by the CM/ECF system.

did not obtain her undergraduate degree, and held several skilled jobs in the financial industry. *See, e.g.*, [#9-2 at 53-54; #9-7 at 276, 281-87, 292]. Ms. LaVoie alleges she became disabled on February 6, 2012, due to obesity, posttraumatic stress disorder ("PTSD"), back problems, neuropathy, agoraphobia, bi-lateral knee replacement, panic and anxiety, paranoia, chronic pain, and complex PTSD. *See* [#9-4 at 150-51; #9-7 at 274]. Ms. Hill was fifty years-old on the alleged onset date of her claimed disability.

The Social Security Administration denied Plaintiff's application administratively on June 10, 2015. *See* [#9-4 at 149]. Ms. Hill requested a hearing before an Administrative Law Judge ("ALJ"), *see* [#9-5 at 174], which ALJ Jamie Mendelson ("the ALJ") held on January 3, 2017, *see* [#9-2 at 37]. The ALJ received testimony from the Plaintiff and Vocational Expert Aimee Spinelli (the "VE") at the hearing. *See* [*id.* at 36-91].

Relevant here, Plaintiff testified to her numerous psychological ailments. She explained that she was diagnosed with PTSD and complex PTSD stemming from the terrorist attacks of September 11, 2001 on the World Trade Center where Plaintiff worked (Plaintiff was trapped in a subway car under World Trade Center Building 1 when the attacks occurred) and that she suffers from intense anxiety and frequent panic attacks, which make it difficult for her to leave her home. [#9-2 at 61-63]. Ms. LaVoie attested that she once went ten days without leaving her home, *see* [*id.* at 72], and that she had to conduct several "practice runs" before attending the hearing to avoid exacerbating her anxiety, [*id.* at 67-68]. Ms. LaVoie continued that she feels very anxious being in public, and that she becomes anxious if shopping in stores where there are no windows or where she cannot see the windows. *See* [*id.* at 64].

Ms. LaVoie also testified to issues with concentration and memory, stating that she "constantly go[es] off on tangents" because she tends to sporadically remember things that she

could not remember previously. [#9-2 at 66]; *see also* [*id.* at 76 (stating that she had issues using the computer because she "get[s] lost.")]. She continued that she also struggles with paranoia, believing the "system is rigged" against her and fearing that she will never find relief from her pain; that she struggles with anger issues and lashing out at people; and that she struggles with personality changes, stating that she is "not who [she] was" and that she is broken. [*Id.* at 66-67]. Ms. LaVoie also explained that she struggles mightily with sleeping throughout the night, but that recent medication adjustments have allowed for up to four hours of sleep at a time. [*Id.* at 69].

Plaintiff further testified that her mental ailments and her medications have contributed to significant weight gain that keeps her sedentary. *See* [#9-2 at 54, 70]. In addition, Ms. LaVoie stated that certain medications cause her to self-mutilate "the top of [her] head, [her] face, [her] shoulders, [her] bicep, and [her] forearm, and [her] thigh" as a form of coping with the "pain inside of [her]." [*Id.* at 65]. Ms. LaVoie then explained that other medications caused issues with her motor functioning, causing her to fall and lose coordination regularly while other medications affected her cognitive functioning and even caused hallucinations. [*Id.* at 70-71]. But Ms. LaVoie did state that eye movement desensitization and reprocessing therapy ("EMDR") was the only therapy that helped. *See* [*id.* at 89].

The VE also testified at the hearing. The VE first summarized Plaintiff's past relevant work. *See* [#9-2 at 79-80]. The VE then considered the work an individual could perform with no exertional limitations but with the non-exertional limitations of understanding, remembering, and carrying out only simple instructions and tasks learned in three months on the job and occasionally interacting with supervisors, co-workers, and members of the public. *See* [*id.* at 80-81]. The VE testified that this individual could not perform any of Ms. LaVoie's past relevant work either as generally or as actually performed. [*Id.* at 81]. But the VE explained that, consistent

with the Dictionary of Occupational Titles ("DOT"), such an individual could perform the unskilled, medium exertion jobs of janitor, hand packager, and laundry worker—each with a specific vocational preparation ("SVP")[2] level of 2. *See* [*id.*]. The VE also testified that, consistent with the DOT, an individual could perform these three jobs even if requiring the additional limitations of no interaction with the public and only occasional changes in the work setting. [*Id.*]. However, the VE explained that such an individual could not perform any of the three jobs with the additional physical limitation of having to rotate between sitting and standing every 15 minutes, because "every 15 minutes would be too excessive" and would affect that individual's ability to consistently perform the duties of the jobs. [*Id.* at 82]. On the other hand, if that individual needed to rotate between sitting and standing every hour, the VE testified that she could perform the light, seated jobs of small products assembler, mailroom clerk, and office helper—all SVP level 2. [*Id.* at 83].

When questioned by Plaintiff's attorney, the VE testified that if an individual had similar restrictions as the individual hypothesized by the ALJ but had limited reasoning, math, and language capabilities, then such an individual could not perform jobs of janitor, hand packager, or laundry worker. [*Id.* at 84-85]. The VE stated the same was true for the jobs of small products assembler, mailroom clerk, and office helper. *See* [*id.* at 85]. In addition, the VE stated that the additional limitations of being off-task at least 15% of the workday, missing two days per month or being tardy two days per month due to mental ailments, and constant inabilities to maintain

---

[2] SVP refers to the "time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Vigil v. Colvin*, 805 F.3d 1199, 1201 n.2 (10th Cir. 2015) (citing Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991)); 1991 WL 688702 (G.P.O.). The higher the SVP level, the longer time is needed to acquire the skills necessary to perform the job. Jeffrey S. Wolfe and Lisa B. Proszek, SOCIAL SECURITY DISABILITY AND THE LEGAL PROFESSION 163 (Fig. 10-8) (2003).

concentration, stay focused, and non-disruptive to others would preclude all the jobs identified. *See* [*id.* at 85-87].

On May 2, 2017, the ALJ issued a decision finding Ms. LaVoie not disabled under the Act. [#9-2 at 29]. Plaintiff requested Appeals Council review of the ALJ's decision, which the Appeals Council denied, rendering the ALJ's decision the final decision of the Commissioner [*id.* at 1-6]. Plaintiff sought judicial review of the Commissioner's final decision in the United States District Court for the District of Colorado on January 12, 2018, invoking this court's jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole. *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *cf. Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993) ("[I]f the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." (internal citation omitted)). The court may not reverse an ALJ simply because she may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision. *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted). But "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted). The court may not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole,

including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty,* 515 F.3d at 1070 (internal citation omitted).

## ANALYSIS

### I. The ALJ's Decision

An individual is eligible for DIB benefits under the Act if she is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1). An individual is determined to be under a disability only if her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A). The disabling impairment must last, or be expected to last, for at least 12 consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214–15 (2002). Additionally, the claimant must prove she was disabled prior to her date last insured. *Flaherty*, 515 F.3d at 1069.

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act. 20 C.F.R. § 404.1520(a)(4)(v). *See also Williams v. Bowen*, 844 F.2d 748, 750–52 (10th Cir. 1988) (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750. Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied. *Id.* Step two considers "whether the claimant has a medically severe impairment or combination of impairments," as governed by the Secretary's severity regulations. *Id.*; *see also* 20 C.F.R. § 404.1520(e). If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision

maker proceeds to step three. *Williams*, 844 F.2d at 750. Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. § 404.1520(d). *Id.* At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity ("RFC"), which defines the maximum amount of work the claimant is still "functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability." *Williams*, 844 F.2d at 751; *see also id.* at 751–52 (explaining the decisionmaker must consider both the claimant's exertional and nonexertional limitations). The ALJ compares the RFC to the claimant's past relevant work to determine whether the claimant can resume such work. *See Barnes v. Colvin*, 614 F. App'x 940, 943 (10th Cir. 2015) (citation omitted). "The claimant bears the burden of proof through step four of the analysis." *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's RFC, age, education, and work experience. *Neilson*, 992 F.2d at 1120. The Commissioner can meet her burden by the testimony of a vocational expert. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99, 1101 (9th Cir. 1999).

The ALJ found that Ms. LaVoie met the insured status requirements for DIB through December 31, 2017, and had not engaged in substantial gainful activity since February 6, 2012. [#9-2 at 19]. At step two the ALJ determined Ms. LaVoie had the following severe impairments: PTSD, major depressive affective disorder, bipolar disorder, and generalized anxiety disorder. [*Id.*]. At step three the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d)). [*Id.* at 20]. The ALJ

then determined Plaintiff had the RFC to perform work at all exertional levels subject to several non-exertional limitations [*id.* at 21], and concluded at step four that Ms. LaVoie could perform her prior relevant work [*id.* at 27]. At step five the ALJ concluded that there existed additional jobs in the national economy that Ms. LaVoie could perform. [*Id.* at 28].

Ms. LaVoie now appeals the ALJ's decision to this court. In doing so, she raises just one issue: "[t]he ALJ erred by failing to analyze the medical opinion evidence in accordance with the regulations, Agency policy, and Tenth Circuit precedent." [#14 at 1]. I consider this argument below.

## II.     The RFC: Weighing the Medical Opinions

In assessing a claimant's RFC, the ALJ must consider the combined effect of all medically determinable impairments, including the severe and non-severe. *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); 20 C.F.R. § 404.1529(a); SSR 96-9p. The ALJ must also address medical source opinions. *See Vigil v. Colvin*, 805 F.3d 1199, 1201-02 (10th Cir. 2015). A claimant's RFC is the most work the claimant can perform, not the least. 20 C.F.R. § 404.1545; SSR 83-10. The ALJ's RFC assessment must be consistent with the whole record and supported by substantial evidence. *See generally Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004); SSR 96-8p. If it is, the court will not reverse the ALJ's decision even if it could have reached a different conclusion. *Ellison*, 929 F.2d at 536; *see also Flaherty*, 515 F.3d at 1070 (explaining that the reviewing court may not "reweigh or retry the case.").

The ALJ determined that Plaintiff retained the RFC to

perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can understand, remember, and carry out simple instructions and tasks that can be learned on the job in three months' time; the claimant can make simple work-related decisions; the claimant can occasionally interact with supervisors and coworkers, but can have no interaction with members

of the public; and the claimant can tolerate occasional routine changes in the work setting.

[#9-2 at 21].  Ms. LaVoie argues that the ALJ improperly weighed the opinions of Plaintiff's treating sources: Drs. David Kern, Howard Entin, and Joel Shebowich.  *See* [#14 at 4-7].  Plaintiff contends that these opinions demonstrate greater non-exertional limitations than those assessed by the ALJ's RFC determination, and that the ALJ failed to provide specific, legitimate reasons for discrediting these opinions in accordance with the relevant regulations.  *See* [#14 at 9-25].  Ultimately, Ms. LaVoie argues that substantial evidence does not support the ALJ's conclusions as to the opinions of Drs. Kern, Entin, and Shebowich.  *See* [*id.*].

In considering Ms. LaVoie's challenge to the ALJ's decision, the court begins its discussion of the relevant medical evidence beginning in 2012, as Plaintiff alleges February 6, 2012 as the date of onset of her disability and her medical records prior 2012 do not mention her mental ailments, which are the basis for the instant appeal.  *See generally* [#9-10 at 541-612].

A.     The Medical Record

2012

On July 13, 2012, Plaintiff reported to Dr. Shebowich a history of PTSD and that she and her husband were attending marital counseling for their marital problems.  [#9-9 at 487].  Dr. Shebowich's physical exam revealed that Ms. LaVoie was pleasant, comfortable, and mobile, but that Ms. LaVoie had some anxiety and emotional lability during the visit when discussing her marriage and the events of 9/11.  [*Id.* at 487-88].  Dr. Shebowich noted that Plaintiff was alert and oriented and had normal and appropriate affect, clear thought process with normal reasoning and conversational tone and logic, no flight of ideas, and no psychomotor retardation.  [*Id.* at 488].

On October 22, 2012, Plaintiff presented to Dr. Shebowich to follow-up on her depression.  *See* [#9-9 at 442].  Ms. LaVoie stated that she used Xanax several times per week for her anxiety,

that life stressors (i.e., her divorce) made her depressed, and that she had seen a new life coach/therapist given that her previous therapist had a stroke. [*Id.*]. Upon physical examination, Dr. Shebowich indicated that Plaintiff was pleasant, comfortable, mobile, alert, oriented, emotional at times, talkative, and had a clear thought process with normal reasoning and converational tone and logic, no flight of ideas, and no psychomotor retardation. *See* [*id.*].

Plaintiff returned to Dr. Shebowich for a follow-up appointment on November 9, 2012. *See* [#9-9 at 446]. Plaintiff reported that her sleep seemed less restful and that she was more obsessive with organization but that this did not adversely affect her days. *See* [*id.*]. Upon physical exam, Dr. Shebowich indicated that Plaintiff was alert and oriented and that Plaintiff had a normal and appropriate affect, clear thought process with normal reasoning and converational tone and logic, no flight of ideas, and no psychomotor retardation. [*Id.*]. Dr. Shebowich reported that Plaintiff "is doing well on current meds" and that he would try adjusting Plaintiff's medications to account for the compulsive behavior. *See* [*id.*].

On December 10, 2012, Plaintiff had a follow-up appointment with Dr. Shebowich. [#9-9 at 450]. Plaintiff reported some medication side effects with an increased dosage, that she continued to see her therapist weekly and felt like "she is getting better at discussing her feelings and situation," that her anxiety is getting better, that her use of Xanax was occasional, and that she was gaining weight. *See* [*id.*]. Again, Dr. Shebowich noted that Plaintiff was alert and oriented and had normal and appropriate affect, clear thought process with normal reasoning and converational tone and logic, no flight of ideas, and no psychomotor retardation. [*Id.*]. Dr. Shebowich also indicated that Plaintiff still struggled with PTSD at times, but "overall she feels she is stable and getting 'back on her feet'", and that Plaintiff denied depression prior to the events of 9/11, which has only improved gradually since. [*Id.*].

Ms. LaVoie saw Dr. Shebowich for a consultation on May 6, 2013. [#9-9 at 480]. Plaintiff reported that she had been attending weekly therapy, did not have any medication side effects, and that she may be divorcing her husband. *See* [*id.*]. Dr. Shebowich indicated that Plaintiff was talkative, alert, and oriented, and had clear thought process with normal reasoning and conversational tone and logic, no flight of ideas, and no psychomotor retardation. [*Id.*]. Dr. Shebowich noted that Plaintiff did not show signs of bipolar disorder and that her major depressive affective disorder was doing better on venlataxine. *See* [*id.*].

Ms. LaVoie presented to Dr. Shebowich for a medication consultation on June 28, 2013. [#9-9 at 485]. Ms. LaVoie reported that she had recently separated from her husband but was getting along better with him, that she felt well despite the stress, that she had been picking at her skin to the point of bleeding, and that she had been seeing her therapist twice a week. [*Id.*]. Dr. Shebowich noted that Plaintiff was alert and oriented, very talkative, and had appropriate and normal affect, clear thought process with normal reasoning and conversational tone and logic, no flight of ideas, and no psychomotor retardation. [*Id.*]. Dr. Shebowich also indicated that Plaintiff had begun addressing her PTSD with her therapist and that Plaintiff's major depressive affective disorder was doing well with therapy and medication despite some recent stressors causing setbacks. [*Id.* at 485-86].

On August 12, 2013, Plaintiff saw Dr. Shebowich for a follow-up appointment and reported that she wanted to decrease her medications overall because with the anniversary of 9/11 approaching she wanted to see if her medications actually helped her symptoms, that she was starting EMDR soon and continued to see her therapist regularly, and that she felt depressed and still had anxiety while in public but no panic episodes. [#9-9 at 491]. A physical exam revealed

that Plaintiff was alert and oriented, talkative, and had appropriate and normal affect, clear thought process with normal reasoning and converational tone and logic, no flight of ideas, and no psychomotor retardation. [*Id.*].

On October 30, 2013, Plaintiff presented to Dr. Shebowich and reported that EMDR seemed to be helping with her anxiety, that she felt less anxious and irritable, and used less Xanax. [#9-9 at 444]. A physical exam revealed that Plaintiff was alert and oriented and had a normal and appropriate affect, clear thought process with normal reasoning and converational tone and logic, no flight of ideas, and no psychomotor retardation. [*Id.*]. Dr. Shebowich indicated that Ms. LaVoie's PTSD was "improving with combinations of therapy" and that Ms. LaVoie's major depressive affective disorder was "doing much better on current meds." [*Id.* at 445].

## 2014

On June 18, 2014, Plaintiff presented to Dr. Shebowich and reported that she felt more depressed since her mother died 5 months ago, that she felt detached frequently, that she continued to see her therapist regularly, that she rarely used Xanax, that she was not sleeping well, and that she was gaining weight despite increased activity. [#9-9 at 482]. A physical exam revealed that Ms. LaVoie was pleasant and cooperative, mobile, obese, alert, and oriented, and had normal and appropriate affect despite crying when discussing her mother's passing, clear thought process with normal reasoning and converational tone and logic, no flight of ideas, and no psychomotor retardation. [*Id.* at 482-83]. Dr. Shebowich noted that Ms. LaVoie was overall "doing well and understands that TLC will make a great impact on her overall health and improving her comorbidities", that her major depressive affective disorder had "improved with meds" (though she still dealt with significant symptoms of depression), and that her PTSD was helped by therapy and EMDR. [*Id.* at 483].

Plaintiff presented to Dr. Shebowich for a medication follow-up and to discuss multiple concerns on July 21, 2014.  [#9-9 at 489].  Ms. LaVoie reported that she had a "great vacation," but that she had returned to a "great deal of stress", such as separating from her husband and medication side effects, and Plaintiff reported that she had recently started exercising.  [*Id.* at 489].  A physical exam revealed that Plaintiff was alert and oriented and had normal and appropriate affect, clear thought process with normal reasoning and converational tone and logic, no flight of ideas, and no psychomotor retardation.  [*Id.*].  Dr. Shebowich indicated that Plaintiff's major depressive affective disorder was still in remission and that Plaintiff would continue medications and therapy for her PTSD.  [*Id.*].

On August 18, 2014, Plaintiff saw Dr. Shebowich for a follow-up appointment.  [#9-9 at 493].  Plaintiff reported that she was keeping a log of emotions and activities since starting a new medication, that she seemed to become less motivated and active since starting new medications, that she was sleeping well, and had no issues with concentration.  [*Id.*].  A physical exam revealed that Plaintiff was alert and oriented, somewhat teary eyed at one point, and had appropriate and normal affect, clear thought process with normal reasoning and converational tone and logic, no flight of ideas, and no psychomotor retardation.  [*Id.*].

Plaintiff saw Dr. Shebowich for a follow-up appointment on September 15, 2014.  [#9-9 at 438].  Plaintiff reported that she continued to lose weight on her medications, that her motivation to exercise and socialize had decreased, that she had difficulty concentrating sometimes, and that she had regular follow-up appointments with her therapist.  [*Id.*].  Dr. Shebowich noted that Plaintiff was alert and oriented, talkative, and had appropriate and normal affect with occasional tears when discussing the events of 9/11, clear thought process with normal reasoning and conversational tone and logic, no flight of ideas, and no psychomotor retardation.  [*Id.*].  Dr.

Shebowich indicated that Ms. LaVoie's major depressive affective disorder was "doing better with current meds and with continued therapy" and that Plaintiff had a hard time with her PTSD on the anniversary of 9/11, but that Plaintiff was trying to resume her social activities and exercise. *See* [*id.*].

On October 13, 2014, Plaintiff reported to Dr. Shebowich that she felt "stressed and more depressed as coming up on anniversary of mother's death", but that she was trying to work through this with her therapist, and that she had not been exercising. [#9-9 at 440]. Dr. Shebowich indicated that Plaintiff was alert and oriented, talkative, and occasionally tearful during the exam, but that Ms. LaVoie had clear thought process with normal reasoning and converational tone and logic, no flight of ideas, and no psychomotor retardation. [*Id.*]. Dr. Shebowich noted that Plaintiff struggled with her major depressive affective disorder because of her mother's death and family issues, but that Plaintiff continued with therapy for her PTSD, which Plaintiff felt helped. [*Id.* at 440-41].

Plaintiff followed up with Dr. Shebowich on November 14, 2014. [#9-9 at 448]. She reported that life stressors had been causing more anxiety and that she did not notice a change in anxiety on new medication, that she still had some issues with concentration, that she struggled coping with this time of year given the anniversaries of 9/11 and her mother's passing, that she continued to see her therapist, that she made an EMDR appointment that she felt would help, and that she had not been exercising. *See* [*id.*]. A physical exam revealed that Plaintiff was alert and oriented and had appropriate and normal affect, clear thought process with normal reasoning and converational tone and logic, some flight of ideas, no psychomotor retardation, and no suicidal ideation. *See* [*id.* at 448-49]. Dr. Shebowich noted that Plaintiff still grieved her mother's death,

that her PTSD contributed to her depression, that recent life events exacerbated her PTSD, and that Ms. LaVoie still used Xanax on occasion for her anxiety. [*Id.* at 449].

Ms. LaVoie presented to Dr. Shebowich again on December 12, 2014. [#9-9 at 452]. She reported recent increased anxiety, that she had been doing more and sleeping less, that she had not been exercising, that she had some paranoia all the time with more in the past, that she had no physical conflicts with others, and denied placing herself in any dangerous situations. [*Id.*]. A physical exam revealed that Plaintiff was talkative, rambling frequently, and had some anger directed at caregivers (including Dr. Shebowich), normal judgment, flight of ideas, and no suicidal or homicidal ideation. [*Id.*]. Dr. Shebowich also noted that Plaintiff had some paranoia and was reluctant to take her medications. [*Id.*]. Dr. Shebowich indicated that he believed that bipolar disorder caused Plaintiff's current symptoms and that a psychiatric referral was necessary despite Plaintiff's rebuke, that Plaintiff's PTSD might be the cause of her paranoia and that she should return to therapy, and that Plaintiff's bipolar disorder and PTSD exacerbated her anxiety. [*Id.* at 453].

2015

On January 2, 2015, Plaintiff presented to Dr. Shebowich and reported that she had been sleeping better (roughly 6 hours per night) since starting a new medication, but that she still awakened at night and felt sluggish in the morning, that she felt angry much of the time, that she had not restarted EMDR because she did not feel mentally ready, and that she had been picking at her skin until it bled. [#9-9 at 474]. Dr. Shebowich noted that Plaintiff was talkative and rambling at times, but less than last visit, that Plaintiff was not angry, and that Plaintiff had some marks from scratching. [*Id.*]. Dr. Shebowich stated that he suspected Ms. LaVoie's bipolar disorder to "be improving slowly" even with a very low dose of medication, that the Holidays were difficult

for Plaintiff's PTSD, and that certain medications "do help her with social anxiety when she takes it." [*Id.* at 478].

Upon referral, Plaintiff had initial psychiatric screenings with Dr. Kern on January 6, 7, and 13, 2015. *See* [#9-8 at 422]. Dr. Kern noted that Ms. LaVoie suffered multiple instances of trauma, including the loss of her father and mother, the events of 9/11, and her separation from her husband. *See* [*id.*]. Dr. Kern continued that Plaintiff presented with rapid speech, flight of ideas, racing thoughts, elevated/irritable/unstable mood, and safety concerns; he also indicated that Ms. LaVoie's physical ailments, in addition to life stressors, "clearly were exacerbating her psychiatric symptoms." *See* [*id.*]. A mental status exam revealed that Ms. LaVoie was in moderate distress, boisterous and highly energized, elevated/irritable, extremely talkative to the point that Dr. Kern could not complete the initial screening in the time allotted due to tangentiality and derailing, and that Plaintiff had rapid speech that was loud, continuous, and pressured, an expansive and congruent affect, some paranoia and auditory hallucinations, no visual hallucinations, and no homicidal ideation. *See* [*id.* at 423].

On January 20, 2015, Ms. LaVoie had a follow-up appointment with Dr. Kern. [#9-8 at 424]. Dr. Kern continued medication titration with taper of medications to be eliminated. *See* [*id.*]. Dr. Kern noted that Ms. LaVoie expressed much frustration and that she was angry but not "marshmellowing"; Dr. Kern recommended developing a relationship with a new therapist and discussed determining new doses of medication. *See* [*id.*].

Plaintiff followed up with Dr. Shebowich on February 9, 2015. [#9-9 at 476]. Ms. LaVoie reported that she was seeing a psychiatrist regularly and having her medications adjusted, that she did not experience any medication side effects, that she had been struggling with her bipolar, that she had food cravings and was eating more, that she recently restarted exercising, and that she had

no symptoms while walking, that she had been sleeping better, and that she had some anxiety. [*Id.*]. A physical exam revealed that Plaintiff was talkative, pleasant, and that she had some flight of ideas. [*Id.*]. Dr. Shebowich noted that Ms. LaVoie still "seem[ed] hypomanic" because of her bipolar disorder and that Plaintiff's PTSD contributed to all her symptoms and anxiety. [*Id.* at 477].

Plaintiff presented to Dr. Kern for a follow-up appointment on February 11, 2015. [#9-8 at 424]. Upon reevaluation of Ms. LaVoie's symptoms, Dr. Kern reported that she was "less unstable but still clearing and stabilizing" and that Plaintiff was easier to converse with, but she had continued derailing and flight of ideas. [*Id.*]. Dr. Kern and Ms. LaVoie also discussed whether to increase the dose of her current medications, keep them the same, or decrease them "in the interest of a possible, concerning drug holiday by Ms. LaVoie, possibly without recommendation and approval." [*Id.*].

On March 3 and 24, 2015, Plaintiff again saw Dr. Kern. *See* [#9-8 at 424]. Dr. Kern noted that Plaintiff had ceased taking most medications, but that Ms. LaVoie could not "commit to a single treatment plan for consecutive visits without second-guessing the plan[.]" [*Id.*]. He discussed increasing her current medication as well as introducing a new medication that could improve her mood and motivation. *See* [*id.*].

On March 9, 2015, Ms. LaVoie presented to Dr. Shebowich and reported some compulsive behaviors, that she had been scratching and picking at her skin when stressed, that she did not suffer from hallucinations, that she had been sleeping poorly, and that she did not have any suicidal or homicidal ideations despite her anger. [#9-9 at 478]. A physical exam revealed that Ms. LaVoie was very talkative with some flight of ideas, and that Plaintiff had some pressured speech, some anger at her past medical providers, emotional lability, and that Plaintiff paced during the visit.

[*Id.*]. Dr. Shebowich noted that Plaintiff needed to be seen by a psychiatrist for her bipolar disorder, but that Ms. LaVoie had not agreed to an urgent referral. *See* [*id.* at 479].

Plaintiff presented to Dr. Kern for follow-up appointments on May 13 and 27, 2015. *See* [#9-8 at 424]. Dr. Kern reported that Ms. LaVoie continued to struggle and resist committing to a single treatment plan, which was "indicative of continued mixed mood symptoms as demonstrated by expansive behavior along with reports of sadness, depression and loss of will/drive." [*Id.*]. Dr. Kern indicated that Plaintiff expressed "no expectations, no belief, no trust, numbness, no feelings, no happiness, 'accepting' her fate, now simply consenting and submitting to suggested treatment plans." [*Id.*].

On June 9, 2015, Plaintiff saw Dr. Kern for a follow-up appointment. [#9-8 at 425]. Dr. Kern noted that he continued to adjust Plaintiff's medications "in the search for more optimal symptom control/regulation." [*Id.*].

Plaintiff had a follow-up appointment with Dr. Kern on July 29, 2015. [#9-8 at 425]. Dr. Kern reported that Ms. LaVoie continued to "oscillate from conversation in person to conversation over the phone" regarding a treatment plan, that Ms. LaVoie was impatient with her results and progress, and that Ms. LaVoie was frustrated "that she doesn't feel herself" and wanting her own sense of identity, "requiring further reinforcement and clarification of agreements arrived at from one appointment to the next." [*Id.*].

Ms. LaVoie's therapist Dawn Leopardi provided a Summary of Treatment on August 3, 2015. *See* [#9-8 at 416]. Ms. Leopardi stated that Plaintiff presented with symptoms consistent with PTSD, including intrusive and obsessive thoughts or memories about events, intense psychological and physiological distress, hypervigilance, and persistent negative emotion state,

among others. *See* [*id.*]. Ms. Leopardi also explained that Plaintiff presented with symptoms of a manic episode in November 2014. *See* [*id.* at 417].

On August 5, 2015, Plaintiff presented to Dr. Kern for a follow-up appointment. *See* [#9-8 at 425]. Dr. Kern adjusted Plaintiff's medications, and discussed with her the possibility of a therapeutic pet, her criticisms of providers, and the positives and negatives of current medication with the goal of reaching a plan that best serves Plaintiff. *See* [*id.*].

Plaintiff had her final follow-up appointment with Dr. Kern on September 11, 2015. [#9-8 at 425]. Dr. Kern continued to discuss the appropriate medications and respective dosages for treating Plaintiff's symptoms. *See* [*id.*]. Dr. Kern reported, "[c]ompared to 8 months earlier, while improved and increasingly stable, Ms. LaVoie continues to struggle with incapacitating symptoms of both PTSD and Bipolar Disorder, these having significant impact on her ability to work, relate to others and simply be at peace internally with herself." [*Id.*]. Dr. Kern explained that the goal for Ms. LaVoie was stabilization with medication to provide the best quality of life combined with further therapy. [*Id.*]. A mental status exam revealed mild to moderate distress, rapid speech at times that was not as loud/pressured, less elevated/irritable mood, less expensive affect, racing though more consistent thought content, no psychotic features, and well controlled safety issues at present. [*Id.*].

On September 18, 2015, Plaintiff saw Dr. Shebowich for a consultation and reported that she had continual problems with self-mutilation and picking at her skin until it bled, that she continued to be a recluse, that she had occasional suicidal ideation, and that she had considered a move to Nova Scotia where she had family. [#9-10 at 557]. Dr. Shebowich indicated that Plaintiff was very emotional and angry, fidgety, denied currently feeling suicidal, and had some flight of

19

ideas but held a meaningful conversation.  *See* [*id.*].  Dr. Shebowich noted that Plaintiff was not

doing well with her bipolar disorder and continued to be angry and depressed.  [*Id.*].

Ms. LaVoie's therapist Dawn Leopardi provided a Supplemental Summary of Treatment

on November 24, 2015.  *See* [#9-9 at 498].  Ms. Leopardi stated that Plaintiff continued to present

with persistent symptoms of bipolar disorder and PTSD.  [*Id.*].

On December 11, 2015, Dr. Donna DeSimone provided a psychiatric opinion stating that

Plaintiff suffered from bipolar disorder and that Plaintiff's symptoms, "especially her mood

lability[,] was so severe and debilitating that I advised her to see her psychiatrist and restart

medications." [#9-9 at 508].  Dr. DeSimone opined that it was not advisable for Plaintiff to attempt

working because her mood affected her judgment and cognition.  *See* [*id.*].[3]

2016

On January 4, 2016, Plaintiff saw Dr. Shebowich and reported that she was still trying to

get disability benefits, that she had not been picking at her skin, continued to be a recluse despite

grocery shopping late at night to avoid crowds, that she had no suicidal ideation, and that she was

considering a move to Nova Scotia because she had family there.  [#9-10 at 556].  Dr. Shebowich

indicated that Plaintiff was very talkative and had some flight of ideas, fair eye contact, no pacing

or excessive movement, and no emotional lability.  [*Id.*].  Dr. Shebowich noted that Plaintiff was

not doing well with her bipolar disorder and that Plaintiff continued to be angry and depressed.

*See* [*id.* at 556].

---

[3] The ALJ gave no weight to this opinion, and Ms. LaVoie does not challenge that determination
on appeal.

Ms. LaVoie's therapist Dawn Leopardi provided a Supplemental Summary of Treatment on January 5, 2016. *See* [#9-9 at 507]. Ms. Leopardi stated that Plaintiff continued to present with persistent symptoms of bipolar disorder and PTSD. [*Id.*].

On February 24, 2016, Dr. Entin initially evaluated Plaintiff at Colorado PsychCare, P.C. [#9-9 at 520; #9-10 at 624]. Dr. Entin reported that Plaintiff presented as labile, depressed, anxious with panic attacks, hyper, pressured, irritable, and that Plaintiff had occasional auditory hallucinations and insomnia, decreased motivation and interest, some suicidal ideation, racing thoughts, and that Plaintiff complained of severe problems with concentration, focus, and distractibility. *See* [#9-9 at 520; #9-10 at 625]. A mental status exam revealed pressured speech, rambling and racing thoughts, fair insight, some mild auditory hallucinations, high anxiety, difficulty with focus and concentration, but that Plaintiff was alert and oriented, was not suicidal or homicidal, and had intact general knowledge and memory. *See* [#9-9 at 520; #9-10 at 625].

Plaintiff presented to Dr. Entin on March 16, 2016. *See* [#9-9 at 539]. Dr. Entin noted Plaintiff's current symptoms as depression, anxiety, and hypomania, and noted that Plaintiff's sleep was interrupted and her energy level was normal. [*Id.*]. A mental status exam revealed that Plaintiff appeared normal and oriented, that her attention and concentration were good, that her speech was pressured and articulate, that her thought process was goal directed and rambling, that her insight was fair, that her memory and knowledge were intact, that her mood was anxious, and that Plaintiff was not suicidal or homicidal. [*Id.*].

On March 18, 2016, Plaintiff had a follow-up appointment with Dr. Shebowich and reported that she had continued to see her therapist, that she had ceased EMDR for the time being, and that she felt dependent on Xanax for her anxiety despite her psychiatrist's recommendation that she use Xanax at night only. [#9-10 at 555]. Dr. Shebowich noted that Plaintiff was much

calmer, had much less flight of ideas, and was not angry. [*Id.*]. Dr. Shebowich also noted that Plaintiff's mania seemed to be "resolving on current meds" and that Plaintiff felt Xanax helped her cope with the world better despite not getting out of her home much. [*Id.*].

On April 13, 2016, Plaintiff presented to Dr. Entin for a follow-up appointment. [#9-9 at 538]. Dr. Entin noted Plaintiff's current symptoms as depression, anxiety, and hypomania, and that Plaintiff's sleep was frequently interrupted and her energy level was normal. [*Id.*]. A mental status exam revealed that Plaintiff was oriented, that her speech was pressured, that her thought process was rambling, that her insight was fair, that she was not suicidal or homicidal, that her attention and concentration were good, that her memory and knowledge were intact, and that her mood was anxious. [*Id.*].

Plaintiff saw Dr. Shebowich on April 29, 2016, and reported that she continued to be recluse, that she got out only 25% of days, that she continued to see her therapist, that her medications had been adjusted to no avail, and attributed her symptoms to her PTSD and not her bipolar disorder. *See* [#9-10 at 553]. A physical exam revealed that Plaintiff was pleasant, comfortable, angry, and had continuous talking, but that she calmed down when discussing her physical instead of mental health, and that she did not have flight of ideas. [*Id.* at 554]. Dr. Shebowich noted that Plaintiff felt she was not being treated correctly for her bipolar disorder, that Plaintiff is angry but no longer manic, and that Plaintiff felt like her PTSD was the root of all her problems.

Plaintiff returned to Dr. Entin on May 17, 2016. [#9-9 at 537]. Dr. Entin reported Plaintiff's symptoms as moderate depression, high anxiety, hypomania that was less pressured but still high, and cognitive issues with concentration and distractibility; he also noted that Plaintiff's energy level was low and fatigued. *See* [*id.*]. A mental status exam revealed that Plaintiff appeared

normal and oriented with pressured speech, a goal directed thought process, good to fair insight, no suicidal or homicidal ideation, intact memory and knowledge, good concentration and attention, and an anxious mood. *See* [*id.*].

On June 21, 2016, Plaintiff had a follow-up appointment with Dr. Entin. [#9-9 at 536]. Dr. Entin reported Ms. LaVoie's symptoms as mild/moderate depression, anxiety, hypomania, and cognitive issues with attention; he also noted that Plaintiff's energy level was normal and fatigued. [*Id.*]. A mental status exam revealed pressured and articulate speech, rambling thought process, good to fair insight, no suicidal or homicidal ideation, and scattered and disorganized cognition. [*Id.*].

On July 26, 2016, Plaintiff presented to Dr. Shebowich for a consultation and reported that she had improved her diet, that her sleep had improved, that her psychiatrist stopped her medications because of negative side effects, and that she felt like she had a "clear brain" since stopping her medications 6 weeks previously. [#9-10 at 548]. Dr. Shebowich noted that Plaintiff had rapid, and at times pressured, speech, but no flight of ideas, and that Plaintiff was off her bipolar disorder medications and was continuing to work with her therapist. *See* [*id.* at 549].

Plaintiff saw Dr. Entin again on August 2, 2016. [#9-9 at 535]. Dr. Entin noted mild depression, mild/moderate anxiety, hypomania, normal and fatigued energy, and scattered, disorganized, and pressured cognition. [*Id.*]. A mental status exam revealed that Plaintiff appeared normal and oriented with clear and pressured speech, goal directed thought process, no suicidal or homicidal ideation, fair insight, good attention and concentration, intact memory and knowledge, and normal mood/affect. [*Id.*].

Plaintiff returned for a follow-up appointment with Dr. Entin on September 15, 2016. [#9-9 at 534]. Dr. Entin noted mild/moderate depression, high anxiety, hypomania, and scattered and

mildly disorganized cognition. [*Id.*]. A mental status exam revealed that Ms. LaVoie appeared normal and oriented with pressured speech, goal directed and rambling thought process, fair insight, no suicidal or homicidal ideation, good attention and concentration, intact memory and knowledge, and an anxious and angry mood/affect. [*Id.*].

Ms. LaVoie's therapist Dawn Leopardi provided a Supplemental Summary of Treatment on October 3, 2016. *See* [#9-9 at 540]. Ms. Leopardi stated that Plaintiff continued to present with persistent symptoms of bipolar disorder and PTSD. [*Id.*].

On October 25, 2016, Plaintiff presented to Dr. Entin for a follow-up appointment. [#9-9 at 533]. Dr. Entin noted depression and feeling numb and helpless, anxiety, hypomania, tangential speech, and mildly disorganized cognition. *See* [*id.*].

On November 28, 2016, Dr. Entin provided a summary of Ms. LaVoie's psychiatric treatment. *See* [#9-10 at 624]. Dr. Entin explained that over the several months of treatment Plaintiff did not take her medication consistently and was often irritable, grandiose, disorganized, and distractible with lability. *See* [*id.* at 626]. Dr. Entin reported that Plaintiff still struggled with depression, though it improved somewhat on certain medications; that Plaintiff has some interest and motivation; that Plaintiff's anxiety remained high with occasional panic attacks; that Plaintiff is agoraphobic; that Plaintiff is less irritable, has less racing thoughts, and is clearly calmer on lithium; that Plaintiff's sleep is much better, but her energy remains low; and that Plaintiff's speech is more logical, less tangential and pressured, but that she is still often scattered and disorganized. [*Id.*]. Dr. Entin concluded that Plaintiff's inability to consistently take her medications prohibited her from maintaining a consistent and stabilized mood, and that Plaintiff remained far too labile as well as irritable, scattered, pressured, angry, distracted, obsessive, grandiose, and excessive to maintain gainful employment. [*Id.*].

## B.     Treating Source Opinions

The Social Security regulations afford a treating source opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *cf. Garcia v. Colvin*, 219 F. Supp. 3d 1063, 1071 (D. Colo. 2016) ("The distinction between *not inconsistent* and *consistent* is significant. The treating source opinions should not be accorded controlling weight if they contradict other substantial evidence in the record, but they do not necessarily have to reach the exact same conclusions." (emphasis in original)). Generally, the opinion of an examining source is entitled to more weight than the opinion of a non-examining source. *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); 20 C.F.R. § 404.1527(c)(1). Indeed, the opinion of an examining source is in no way "dismissable," *see Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012), and may be dismissed or discounted only upon an examination of the factors provided in the regulations and "specific, legitimate reasons for rejecting it[,]" *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003).

But even if the ALJ does not afford the treating source opinion controlling weight, the ALJ owes that opinion deference and must weigh that opinion using all the factors provided in 20 C.F.R. § 404.1527(c)(1)-(6). *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); SSR 96-2p, 1996 WL 374188, at *4. These factors include:

1. the length of the treatment relationship and the frequency of examination;
2. the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed;
3. the degree to which the physician's opinion is supported by relevant evidence;
4. consistency between the opinion and the record as a whole;
5. whether or not the physician is a specialist in the area upon which an opinion is rendered; and
6. other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (quotation marks omitted). Neither the regulation nor the court require a factor-by-factor recitation, but the ALJ's findings must be "sufficiently specific to make clear" the weight assigned to the treating source opinion and the reasons for that weight. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (internal quotation marks omitted); *accord Watkins*, 350 F.3d at 1301 ("if the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." (internal quotation marks omitted)).

**David Kern, M.D.** On May 11, 2015, Dr. Kern completed a Medical Opinion Questionnaire regarding Ms. LaVoie's mental impairments. *See* [#9-8 at 418]. Dr. Kern indicated Ms. LaVoie's diagnoses as PTSD and mood disorder, and indicated that Ms. LaVoie's prognosis was fair to good. [*Id.*].

Dr. Kern then assessed Ms. LaVoie's mental abilities and aptitude in 25 areas of mental functionality needed to do any job. He opined that Ms. LaVoie had an "unlimited or very good" ability (i.e., functionality is satisfactory or more) to adhere to basic standards of neatness and cleanliness; maintain regular attendance and punctuality within customary, usually strict tolerances; and ask simple questions or request assistance. [*Id.* at 418-19]. He also opined that Plaintiff had a "good" ability (i.e., functionality is limited but satisfactory) to travel in an unfamiliar place; use public transportation; understand and remember very short and simple instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; be aware of normal hazards and take appropriate precautions; understand and remember detailed instructions; and set realistic goals or make plans independently of others. [*Id.* at 418-20]. Dr. Kern then indicated that Ms. LaVoie had a "fair" ability (i.e., functionality is limited but not precluded) or "poor or no[]" ability (i.e., no useful

functionality) to interact appropriately with the general public (fair); maintain socially appropriate behavior (fair); remember work-like procedures (good to fair); maintain attention for two-hour segments (fair to poor or none); work in coordination with or proximity with others without being unduly distracted (fair to poor or none); complete a normal workday and workweek without interruptions from psychologically based symptoms (poor or none); perform at a consistent pace without an unreasonable number and length of reset periods (poor or none); accept instructions and respond appropriately to criticism from supervisors (poor or none); get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes (poor or none); and deal with stress of semiskilled and skilled work (fair to poor or none). [*Id.* at 418-20].

Dr. Kern concluded that Ms. LaVoie had the "capacity to work to a limited degree dependent on specific job requirements and subsequent reactive symptoms." [*Id.* at 420]. He also noted that Plaintiff's impairments or treatment would result in more than two absences from work each month. [*Id.*].

The ALJ afforded Dr. Kern's opinion only partial weight. *See* [#9-2 at 26]. The ALJ explained that the record supported his opinion regarding significant difficulties with social interaction, but that his findings that Plaintiff had no useful ability to complete a normal workday and workweek without interruptions from psychologically based symptoms or to perform at a consistent pace without an unreasonable number and length of reset periods overstated Plaintiff's limitations. [*Id.*]. The ALJ found that these significant limitations were "not consistent with [Ms. LaVoie's] treatment records and her abilities regarding her volunteer activities and the work she performed for less than substantial gainful activity earnings." [*Id.*]. The ALJ also noted the relatively short treatment relationship of four months and the "few" appointments Plaintiff had with Dr. Kern as additional reasons for affording Dr. Kern's opinion only partial weight. [*Id.*].

Lastly, the ALJ stated that Dr. Kern's findings were inconsistent, as he indicated that Plaintiff had no functional limitations in her ability to maintain regular attendance and punctuality within customary, usually strict tolerances, but that she would miss 2 days or more per month because of her ailments. *See* [*id.*].

**Howard Entin, M.D.** On November 28, 2016, Dr. Entin completed a Medical Opinion Questionnaire concerning Ms. LaVoie's mental impairments. [#9-10 at 620]. Dr. Entin indicated Ms. LaVoie's diagnoses as major depression, panic attacks, bipolar I disorder, and PTSD, and indicated Plaintiff's prognosis as fair to poor as she struggles to have a consistent, stable mood. *See* [*id.*].

Dr. Entin then assessed Ms. LaVoie's mental abilities and aptitude in 25 areas of mental functionality needed to do any job. Unlike Dr. Kern, Dr. Entin found no areas where Ms. LaVoie's functionality was satisfactory or better. *See* [*id.* at 620-22]. But Dr. Entin indicated that Ms. LaVoie had a "good" ability to adhere to basic standards of neatness and cleanliness (also noted as "fair"); understand and remember very short and simple instructions; ask simple questions or request assistance; and be aware of normal hazards and take appropriate precautions. [*Id.* at 620-21]. Dr. Entin also opined that Ms. LaVoie had a "fair" ability to remember work-like procedures because she gets confused at times; carry out very short and simple instructions because she gets distracted easily; maintain regular attendance and be punctual within customary, usually strict tolerances; make simple work-related decisions; and set realistic goals or make plans independently of others because of poor follow up. *See* [*id.* at 620-22]. Dr. Entin also indicated that Ms. LaVoie had a "poor or no[]" ability to interact appropriately with the general public; travel in unfamiliar places; maintain attention for two-hour segments; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly

distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to change in a routine work setting; deal with normal work stress; understand and remember detailed instructions; carry out detailed instructions; and deal with stress of semiskilled and skilled work. [*Id.*]. Dr. Entin also opined that Ms. LaVoie's impairments or treatment would result in more than two absences from work each month. [*Id.* at 622].

The ALJ afforded Dr. Entin's opinion only partial weight because it was rendered "after a relatively short period of treatment" and was not entirely consistent with mental status findings in the record. [#9-2 at 23]. The ALJ also afforded little weight to Dr. Entin's opinion that Ms. LaVoie would miss two days or more per month because of her mental ailments. [*Id.*].

***Joel Shebowich, M.D.*** Plaintiff's primary care physician Dr. Shebowich provided two medical opinions concerning Ms. LaVoie's ailments. In an April 24, 2015 Medical Opinion regarding Plaintiff's ability to perform physical activities Dr. Shebowich noted Plaintiff's diagnoses as complex PTSD and bipolar disorder. [#9-9 at 509]. Relevant here, Dr. Shebowich opined that Ms. LaVoie would often need to take unscheduled breaks of variable length throughout an eight-hour workday due to her psychiatric illness and that Plaintiff would miss more than two days per month of work because of her impairments. *See* [*id.* at 509-10].

In a November 22, 2016 Medical Opinion regarding Plaintiff's ability to perform physical activities Dr. Shebowich noted Ms. LaVoie's diagnoses as bipolar disorder, PTSD, and obesity. *See* [#9-10 at 614]. Dr. Shebowich indicated that Ms. LaVoie required a job that permitted shifting between sitting, standing, or walking at will due to her psychiatric illness. [*Id.*]. Dr. Shebowich

further opined that Plaintiff would need two-three unscheduled breaks of about 20-30 minutes in length depending on the incident during an eight-hour workday. [*Id.* at 614-15]. As before, Dr. Shebowich noted that Ms. LaVoie would miss more than two days per month because of her impairments. *See* [*id.* at 616].

The ALJ afforded each of Dr. Shebowich's opinions little weight. *See* [#9-2 at 26]. The ALJ explained that Dr. Shebowich cited "psychiatric illness" and "emotional illness" as a basis for finding *physical* limitations that Ms. LaVoie's treatment notes did not support and which the ALJ determined Ms. LaVoie did not have. *See* [*id.*]. The ALJ also stated that Dr. Shebowich's opinions were not consistent with one another, though the ALJ does not specifically identify such inconsistencies. *See* [*id.*].

As mentioned, Plaintiff raises a host of challenges to the ALJ's weighing of the treating source opinions. ***First***, Plaintiff argues that the ALJ's conclusions are not "good/specific/supported reasons for rejecting the opinions of Plaintiff's treating sources." [#14 at 9]. Ms. LaVoie contends that the ALJ failed to consider several of the relevant factors identified by the regulations, including the consistencies between the opinions of Drs. Kern, Entin, and Shebowich;[4] the "reasonable knowledge" of Ms. LaVoie's impairments by Drs. Kern, Entin, and Shebowich as treating sources; the weight, if any, given to the fact that Drs. Kern, Entin, and Shebowich were "specialists"; and the fact that Drs. Kern, Entin, and Shebowich examined Ms.

---

[4] On this point, even if all three treating sources noted that Plaintiff would miss two or more days per month because of her impairments, it was not error for the ALJ to assign little weight to Dr. Entin's opinion in this regard merely because it was consistent with Drs. Kern and Shebowich's opinions. *See* [#14 at 15-16]. Indeed, "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (internal quotations and citations omitted) ("[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."). And as discussed below, the ALJ provided sufficiently specific reasons for affording little weight to these opinions.

LaVoie. *See* [*id.*]. But the ALJ *did* consider the length of each source's treating relationship with Plaintiff and the frequency of examinations, the nature and extent of the treatment relationship, the degree to which relevant evidence supported the opinion, and the consistency between the opinion and the record as a whole. *See Langley*, 373 F.3d at 1119. For instance, the ALJ noted that Ms. LaVoie's treatment with Dr. Entin was "a relatively short period of treatment," and that his assessment was not entirely consistent with other findings through her overall record. [#9-2 at 23]. The ALJ further noted that Plaintiff ceased working in 2012 not because of any mental impairments, but because her work contract ended, and that she did not claim that her mental impairments led to the cessation of her work as a dog groomer or para special needs bus aide. [*Id.*]. The ALJ also noted that she only gave partial weight to Dr. Kern because his relationship with Ms. LaVoie was limited to four months, and his indications were internally inconsistent, given her abilities regarding her volunteer activities and the work she performed for less than substantial gainful employment. [*Id.* at 26]. The court does not require a formulaic recitation of each factor so long as the ALJ's findings are "sufficiently specific to make clear" the weight assigned to the treating source opinion. *See Oldham*, 509 F.3d at 1258. And although the ALJ did not afford controlling weight to these treating source opinions, the ALJ properly afforded those opinions some deference based on the factors provided in 20 C.F.R. § 404.1527(c)(1)-(6), which is entirely appropriate. *See Watkins*, 350 F.3d at 1300.

**Second**, Plaintiff argues that the ALJ erred by noting the "short" treatment relationships of Drs. Kern and Entin without explaining why this duration adversely affected the weight assigned to these opinions. *See* [#14 at 11-12]. But this factor is a legitimate factor for the ALJ's consideration, and Plaintiff provides no compelling reason why this court should discredit the ALJ's conclusions in this regard. *Cf. Scott v. Berryhill*, 695 F. App'x 399, 402-04 (10th Cir. 2017)

(affirming ALJ's conclusion that a treating source's opinion was entitled to less weight when the treating source rendered the opinion approximately 14 months in to the treatment relationship and the examinations of the plaintiff were 15 minutes in duration).

**Third**, Ms. LaVoie contends that the ALJ erred in finding that Dr. Kern's limitations were not consistent with Plaintiff's ability to work and volunteer. [#14 at 15]. The court concludes, however, that the ALJ properly considered Ms. LaVoie's alleged activities of daily living in affording Dr. Kern's opinion only partial weight. *See* SSR 96–7p, 1996 WL 374186, at *3 (July 2, 1996); *accord Wilson v. Astrue*, 602 F.3d 1136, 1146 (10th Cir. 2010). Indeed, Plaintiff testified at the hearing before the ALJ that since her alleged onset date she has not maintained substantial gainful employment, though she worked for 2 months as a para special needs bus aide for Douglas County Schools and attempted to open a dog grooming business. *See* [#9-2 at 46-47]. In both instances, Ms. LaVoie testified to reasons other than her mental impairments as reasons for ceasing those activities. *See* [*id.*]. Further, Ms. LaVoie testified to volunteering at an alpaca ranch "shovel[ing] poo", but that it is getting harder to get there because of her issues with driving. *See* [*id.* at 75-76]. Plaintiff contends that the ALJ should have further inquired into Ms. LaVoie's abilities to perform such activities for "the length of a normal workday and workweek", [#14 at 15], but it is Plaintiff's burden to present her claims and establish her disability. *See Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004) ("[I]n cases such as this one where the claimant was represented by counsel at the hearing before the ALJ, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored, and the ALJ may ordinarily require counsel to identify the issue or issues requiring further development." (internal quotations omitted)).

**Fourth**, Ms. LaVoie argues that the ALJ erred in concluding that Dr. Kern's opinion largely overstates Ms. LaVoie's limitations, because the ALJ failed to explain why Dr. Kern's opinion overstates those limitations, especially when Dr. Entin opined to similar limitations. *See* [#14 at 12]. But the ALJ *did* explain that Dr. Kern's limitations were not consistent with Plaintiff's treatment records, which the ALJ discussed thoroughly in assessing Plaintiff's RFC, and were not consistent with Plaintiff's abilities regarding her volunteering and the work performed at less than substantial gainful activity earnings. *See* [#9-2 at 26]. The court finds these to be sufficiently specific reasons for affording little weight to Dr. Kern's opinion, and whether substantial evidence ultimately supports the ALJ's conclusion is an issue the court addresses below.

**Fifth**, Ms. LaVoie takes issue with the ALJ's affording "no weight" to Drs. Entin and Shebowich's opinions that Plaintiff could not maintain gainful employment because such opinions concern issues reserved for the Commissioner. *See* [#9-2 at 26-27]. Plaintiff contends that Drs. Entin and Shebowich were not expressing opinions on matters reserved for the Commissioner, but rather were expressing their own opinions based on Ms. LaVoie's limitations. [#14 at 16]. Ms. LaVoie continues that the ALJ should have recontacted Drs. Entin and Shebowich to clarify their opinions, arranged for a consultative psychological examination, and reviewed the entire medical record. [*Id.* at 16-17]. But I agree with the Commissioner that such conclusions are issues reserved for the Commissioner and are not entitled to controlling weight even if from a treating source. *See Campos v. Astrue*, 373 F. App'x 880, 883 (10th Cir. 2010); 20 C.F.R. § 404.1527(d)(1). And this is not a situation where the ALJ completely ignored these opinions; she instead gave some weight to the portions of these opinions that were not inconsistent with the medical record. *See Mayberry v. Astrue*, 461 F. App'x 705, 708 (10th Cir. 2012) ("While a physician's opinions on issues reserved to the Commissioner are not entitled to controlling weight or any special significance, the

ALJ was still required to provide an evaluation of the opinions and explain h[er] reasons for either rejecting or accepting them.").

*Lastly*, Ms. LaVoie challenges the ALJ's conclusion that the opinions of Drs. Kern, Entin, and Shebowich were not consistent with Plaintiff's medical records, arguing that the ALJ largely ignored the above medical evidence when evaluating these opinions. Ms. LaVoie similarly raises several arguments in this regard that the court finds unpersuasive.

Ms. LaVoie first takes issue with the ALJ's conclusion that Dr. Kern's opinion was internally inconsistent. [#14 at 12]. Plaintiff contends that if the ALJ had any confusion concerning Dr. Kern's opinion, the regulations required the ALJ to re-contact Dr. Kern. *See* [*id.*]. But only a finding that the information the treating physician provided is "inadequate" triggers the ALJ's duty to re-contact a treating source. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001). The ALJ made no determination that Dr. Kern's internal inconsistencies rendered his opinions inadequate and, instead, the ALJ highlighted this as but one of several reasons for affording partial weight to Dr. Kern's opinion. *See id.* at 909 (holding that the ALJ did not err in discrediting the plaintiff's treating physician's opinions where the ALJ concluded that the treating physician failed to explain the inconsistencies between the restrictive functional assessment and the negative diagnostic test results). The same rationale applies to any inconsistencies the ALJ found in Dr. Shebowich's opinions. *See* [#14 at 16].

Ms. LaVoie next asserts that the ALJ impermissibly substituted her own lay opinion for that of Drs. Kern, Entin, and Shebowich by concluding that Drs. Kern, Entin, and Shebowich's opinions were inconsistent with their own treatment notes. *See* [#14 at 13]. The Commissioner argues that the ALJ did no such thing, and further contends that Plaintiff's reliance on *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) is misplaced. *See* [#16 at 10]. The *McGoffin*

court explained that an ALJ may not completely reject a treating source opinion based solely on the ALJ's "speculative inferences from medical reports" or "*due to his or her own credibility judgments, speculation or lay opinion*." *McGoffin*, 288 F.3d at 1252 (emphasis in original). But in *McGoffin*, "despite the fact that Dr. Luc's signature appears directly below the assessment, the ALJ expressed doubt that the assessment was actually that of Dr. Luc." *Id.* The court in *McGoffin* held that it was reversible error for the ALJ to reject a treating source opinion on this basis, especially given unrefuted evidence that the treating source actually *did* render such an assessment. *Id.* ("In this case, the ALJ's unfounded doubt that Dr. Luc agreed with the assessment he signed, in the face of unrefuted evidence to the contrary, was error."). Here the ALJ did not express any doubt as to whether Drs. Kern, Entin, and Shebowich agreed with their purported opinions; rather, the ALJ simply concluded that these opinions were inconsistent with the treatment notes as a whole. *See Mullins v. Comm'r of Soc. Sec.*, No. 1:15-CV-104, 2015 WL 9854828, at *8 (S.D. Ohio Dec. 21, 2015) ("An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rending an RFC finding." (internal quotations and citation omitted)). This was an appropriate conclusion, and the ALJ is solely responsible for resolving evidentiary inconsistencies. *See Allman v. Colvin*, 813 F.3d 1326, 1333 (10th Cir. 2016).

Ms. LaVoie continues that the medical opinions are not inconsistent with the medical record. *See* [#14 at 17]. Plaintiff then recounts the medical evidence summarized above by the court. *See* [*id.* at 17-26]. While the court agrees that Plaintiff's medical records suggest significant mental impairments, there are also medical records suggesting that Plaintiff experiences some relief or improvement from her symptoms through medication and therapy, though records note that Ms. LaVoie is not entirely consistent in following her treatment plans. But the ALJ discussed

this evidence in her decision and thoroughly analyzed the medical record. *See* [#9-2 at 22-27]. To the extent conflicts existed within the medical record regarding the severity of Plaintiff's ailments, the ALJ, not the court, is entitled to resolve such conflicts, *Allman*, 813 F.3d at 1333, as this court may not "displace the agency's choice between two fairly conflicting views", *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004) (brackets omitted). Plaintiff's argument to the contrary essentially invites the court to reweigh the evidence that the ALJ relied on in reaching this conclusion, but this court will not substitute its judgment for the ALJ's when supported by substantial evidence. *See Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000). And as noted, the ALJ is solely responsible for assessing a claimant's RFC based on the medical record, and there is no requirement that an RFC assessment directly correspond to a specific medical opinion concerning the functional capacity in question. *Chapo*, 682 F.3d at 1288.

## CONCLUSION

For the reasons stated herein, the court hereby **AFFIRMS** the Commissioner's final decision.


DATED: November 27, 2018

BY THE COURT:

Nina Y. Wang
United States Magistrate Judge